And we'll move on to our next case, which is United States v. Kolbusz. Mr. Ackerman. Court, please. Alan Ackerman, representing the defendant, Dr. Kolbusz. Good morning. Good morning. Members of the prosecution team, Dr. Kolbusz is seeking trial anew in the alternative, although a lesser alternative, of remand for resentencing. He maintains that his trial was less than fair. He was prohibited from introducing probative and positive testimony concerning his good faith in this particular case. The circumstances are somewhat unusual. It involves a form of keratosis, actinic keratosis, which can have precancerous impact and eventually lead to very significant difficulties in the field of cancer, period. His view of it all was that he owed a duty to patients who he diagnosed with AK, that's what we call it in the briefs, to discern whether they needed treatment and if they did, the nature and extent of the treatment. He maintained that from 2003 forward, based on, actually 2001 forward, based on a Medicare national coverage decision, that he had the wherewithal as a board certified dermatologist to discern what treatment was needed, how often, and the nature and extent of the treatment. Some of it looks fishy, though. The business of having 30 of these keratosis on one head, so to speak, at the same time, I don't think that happens. I would say he pinched the pot a little bit. I would say that he may have submitted claims in excess of perhaps what should have been claimed, and I say perhaps because I'm using guarded language. The defense evidence, I'll skip this government for a moment, the defense evidence came in through Dr. Kollitz and a Dr. Goldberg, and in substance, both testified that AK comes in a massive variety of features, colors, sizes, that you have to touch and palpate in order to really discern whether a patient is suffering. You have to do what, I'm sorry? Palpate. You mean touch it, yeah. Touch and feel and so forth. Look for lumps. Pardon me? Look for lumps. Yes. Isn't the standard procedure to spray some nitrogen? That is when you actually find a lesion, a cancerous lesion that is a single lesion, that you can use the CO2, which is the carbon dioxide spray, and it's a procedure that's fraught with difficulty for the patient. That's really surprising. Having had a number of these things removed, the dermatologist always sprays you with this little stuff, which is coal. It's totally painless. It takes a second or so, and they do it without worrying about whether it's seriously precancerous. It's just there's some risk, so they take it off, and as I said, it takes a second. It doesn't hurt or anything. I don't know why he didn't do this. God forbid, Judge Posner. That was standard. God forbid your arms or back or legs were covered with actus keratosis. What you've just described is utterly inappropriate and cannot be done because the treating dermatologist could not go to each of 20 or 40 or 60 and spray. That must be very unusual. Well, according to Dr. Goldberg, it's not. According to Dr. Ross, it's somewhat, and according to the defendant, he saw a lot of it. Now, maybe he was more careful than others, but he was also a Mohs surgeon. But his patients were going to him frequently, weren't they? They were. I mean, it's one thing. If you only went to a dermatologist every five years or something, you might have accumulated a lot of these keratosis. But if you go frequently, you're only going to have a few. I appreciate the court's comments. And the jury was not permitted to hear why he felt he was being deprived of a good faith basis for what he was doing.  In 2010 and 2011, he brought a significant tortious interference claim against Blue Cross Blue Shield. And as all we see from the record is there was a confidential settlement. What the jury didn't know, and still confidential, but it was a very significant sum that Blue Cross Blue Shield paid to him in able to settle that litigation. Now, should the jury have heard that when Blue Cross Blue Shield offered four separate witnesses who testified, among other things, that they paid the doctor over $1 million from 2003 to 2010 in claims that they said were all fraudulent? Well, if they were all fraudulent, shouldn't the doctor have been told, shouldn't he have been able to tell the jury, wait a second, hold everything. If I'm such a thief and I'm such a crook, then why did this same company pay me X, whatever that figure is, and I assure the court it's significant, in order to conclude and terminate the litigation? He was deprived of that, and he was deprived of more. And this has to do with Medicare. And Medicare is a favored subject of those of us who have reached a mature age, because we have the benefit of Medicare and most of us have supplemental policies. So we're familiar with the procedure. Here, Medicare presented witnesses that said in the period of 2003 to 2010, the doctor submitted upwards of 10,600 claims for treatment of AK over that period of time. Now, he may have been seeing 20 patients a day, five days a week. I don't know. But that's what they were able to present. However, he was precluded from presenting to the jury that from the date of his indictment in October 2012 until he was convicted in August of 2014, I'm sorry, October of 2014, he submitted the same AK formula for his treatment to Medicare on a pre-approval basis, and they approved 90-some-odd percent of those treatments. So what he wanted to express to the jury is, wait a second. This is what I did before. This is what I've done since. And the trial court said no, and they sustained the government's objection. And now I'm going backwards to why some of this is truly unfair in this case. In advance of trial, the government did a survey of sorts by an enterprise called CAHABA, C-A-H-A-B-A, and did a statistical sampling of different dermatologists. And it turns out that Dr. K, I'll call him, Dr. Bob, was an outlier, meaning he had many more claims than all the other dermatologists in the area. Well, he was the only one with the equipment because he spent hundreds and hundreds of thousands of dollars on laser-related equipment, and other physicians sent him patients. But in advance of trial, the government said, never mind, we're not using it. That's fine. In advance of trial, the defense submitted a motion seeking an order barring the use of it. The government responded to this motion in writing, saying, we don't really intend to use it, but depending on the defense, we may want to bring it up on rebuttal. We may want to present rebuttal witnesses. The district court, three weeks before trial, enters an order granting the defense motion to exclude that very evidence because it's, quote, moot. Well, was it really moot when the government now, during trial, and we point out in our brief on October 1, they bring it up, and we have this statistical sampling, and we're going to use it. And we're going to use it because he opened the door in his opening statement by saying, hey, he may be an outlier, meaning the doctor treats more patients than others, but you know what? He's not a crook. So should the government have been allowed to use it? Well, they did over objection. So on the one hand, you have the government being able to present Medicare and Blue Cross, saying he's a crook and a cheat, and on the other hand, he's precluded from offering his own evidence that, wait a second, Blue Cross paid me a small fortune to terminate my litigation against him, and Medicare approved the exact same thing before and after the indictment. Let me ask you a question about something you said earlier about how a settlement that your client had made, what was it, with Blue Cross or someone? It was. Blue Cross, Blue Shield. You said it was a large settlement, but that because it was confidential, the amount couldn't be disclosed at the trial. Is that true? If I was defense counsel, it wouldn't have been true. I would think you have a trial, and it's important to have this information. I'm sorry. I didn't mean to interrupt. Is that the practice, that these settlements are absolutely sacrosanct? I don't know, because that's beyond my understanding, Judge. All I know is I would have approached the district court and asked the district court in advance of trial to enter an order permitting the confidential basis to be exhumed or some darn thing, and getting to confidential basis at the time of sentencing, the trial court ordered a very significant order of restitution, $3.8 million. And Dr. Bob said, wait a second. I made a settlement with Blue Cross. I made a settlement with Aetna. I made a settlement with Humana, so I may owe Medicare, but I don't owe the rest of them because we entered into private settlements. The government said, well, there's no real law in the Seventh Circuit, but the sister circuits say those private agreements, confidential or not, can be trumped by the trial court or this court saying, wait a second, those private agreements, as long as they don't double enhance the victim, they're okay. I think, Frank, I'd ask that the court at the very least remand for resentencing when it comes to the restitution aspect of this. And I thank you. Okay, thank you, Mr. Ackerman. Mr. Lee? Thank you. May it please the court. My name is Stephen Lee. Whether the defendant, Robert Colbus, falsely diagnosed flat brown spots on his patients, which those patients thought were just freckles, as pre-cancerous lesions, and whether he falsely billed Medicare and those patients' private insurers for unnecessary medical services were questions for the jury, questions the jury resolved, and there was more than sufficient evidence to support the convictions. In this case in particular, the jury heard evidence about how the defendant diagnosed flat brown spots on patients as young as 15 years old as being pre-cancerous lesions, and then he billed cosmetic treatments as if he was destroying huge numbers of pre-cancerous lesions, about 491 on the face of that 15-year-old. The evidence was more than sufficient to support the convictions and that issue, as well as the district court's findings in terms of loss and restitution. Defense counsel talked just now about the settlement that Robert Colbus, the defendant, reached with Blue Cross Blue Shield. Now, first of all, I want to correct the record a little bit about what actually happened in terms of the rulings there. In fact, the government raised a motion prior to trial to preclude mention of the civil settlement, and the defendant then informed the district court that it was not going to elicit evidence about the settlement, and so the district court denied the government's motion as moot. Later in the course of the trial, the defendant did testify about the fact that he had sued Blue Cross and Blue Shield during the period covered by the indictment to indicate his good faith, the idea being that he wouldn't have sued Blue Cross Blue Shield unless he believed he was in the right, and the district court allowed that testimony. At the same time, the defense counsel informed the district court that it was not going to seek to ask about the settlement amount, and that distinction was appropriate because the amount of the settlement and the fact that the settlement was actually reached between Blue Cross and the defendant, Dr. Colbus, obviously raises other issues. There are litigation costs involved, and getting into the amount of the settlement or the fact of the settlement would raise issues that had nothing to do with whether... Were any of his patients injured as a result of his methods? Did any of them die of cancer? Your Honor, what happened was the treatments were cosmetic treatments that he falsely billed. The treatments were what? Cosmetic treatments that he falsely billed. At the same time, there were things that could cause and perhaps did cause patient harm. To help cover up his fraud, he ordered patients... That's what I'm asking. Was anybody injured as a result of this? Patients were told to apply creams... You're not answering my question. I'm sorry, Your Honor. Was anybody injured as a result of his treatment methods? They were not harmed physically. Pardon? They were not harmed physically. Well, how were they harmed? Patients were told that the brown spots they had on their face and bodies that they thought were freckles were precancerous lesions. They were told that they might be apt to suffer cancer. That scared patients. That helped scare some patients into coming back every two weeks or a month to get these treatments. Patients made co-payments on these services. Were any of the marks on these people's heads that he removed, were any of them precancerous? Not the ones that he treated using the intense pulse light or the erbium laser treatments. Now, it may be that when he removed... He treated some lesions with liquid nitrogen. Some of those might actually have been actinic keratosis lesions. But the vast majority of the lesions that he supposedly was treating and destroying were not precancerous. And there was medical testimony to that fact? Yes, Your Honor. By whom? Dr. Edward Ross was called by the government. He testified at length. And he testified about the medical literature. He testified about the diagnoses. Was he testifying in the abstract or had he examined the patients? He reviewed patient files, including detailed photographs. I beg your pardon? He testified based on his review of patient files, including photographs. So he did not see the patients. He did it from files and photographs? Yes, Your Honor. Okay. Now, another issue raised by the defendant, defense counsel, was the issue about the district court's decision to bar testimony about the defendant's claims in the post-indictment period. Defense claims of what? The defendant argues that he was not allowed to present a meaningful defense because he was barred in part by testifying about what happened with claims he submitted to Medicare in 2012 and onwards, more than two years after the period covered by indictment. Ultimately, the defendant was allowed to and did present a meaningful defense. His core defense was that he had properly diagnosed these patients' conditions, that he properly treated these patients' conditions, and that he submitted accurate bills, and that he had no reason to doubt any of his diagnosed treatment methods because Medicare and private insurers continued to pay his claims. He was able to make that defense for the period covered by the indictment. He testified about his methods. He called a defense expert to help support his claims, and he was able to point to some correspondence with Blue Cross Blue Shield in the course of his testimony. The fact that the additional element, any additional evidence or argument that would have been supported by the admission of the post-2012 conduct was not relevant, and the district court properly did not abuse its discretion in excluding such evidence, which postdated the charge period by more than two years and which involved review procedures which were very different than the ones in effect in the indictment period. But is he accused of having defrauded Blue Cross? Yes, Your Honor. He was accused of defrauding Blue Cross Blue Shield, Medicare. I thought he made this big settlement with Blue Cross. No, Your Honor. I think that is, again, the record does not go into a lot of details about the settlement. What happened was there was a lot of litigation between the defendant and Blue Cross Blue Shield. Blue Cross Blue Shield put mechanisms in place to stop payment on many of the defendant's claims. There was a settlement in 2011 after the period covered by the indictment to resolve the litigation and various litigation between the defendant and Blue Cross Blue Shield. But that did not cover all of the claims here, and there was an exclusion in the settlement agreement that specifically excluded, that specifically allowed for Blue Cross Blue Shield to receive recovery in the event that there was any kind of later proceeding that involved the fraud that the defendant committed. The defendant also talked just now about the CAHABA statistical sampling. I just want to clear the record on that. I just want to be clear. The government did have CAHABA, a Medicare contractor, do a statistical review to compare Dr. Kolbis with peer dermatologists. But the government did not seek to admit that at trial, and we did not admit that at trial. What defense counsel was talking about just now was a simple analysis of the defendant's own claims, a simple summary of the claims that he himself submitted to Medicare in the period covered by the indictment. It did not compare him to any of his peers, and so this idea that the defendant was trying to raise I think is incorrect. The government did not seek to admit evidence that it had told the district court that it was not going to admit. Unless the court has further questions, the government ends by asking that you affirm the conviction and the sentence, including the restitution order. Okay. Thank you, Mr. Lee. Mr. Ackerman, do you have anything further? The government's suggestion that everything the defendant wanted to present was presented is simply wrong, and the record supports it. And their explanation just now about the CAHABA sampling that they said they weren't using, counsel did not explain or tell you, as we have the actual transcript in our reply brief appendix, that on October 1, in mid-trial, they spring this sampling, and they tell the court, if he presents his defense, we want the opportunity to use it. This is after the trial court had held, three weeks before trial, that they can't use it because they grant the defendant's motion to exclude it. So the explanation presented by my opponent, who I greatly respect, is simply wrong. Thank you. Okay. Thank you, Mr. Ackerman. Mr. Lee?